# District of Columbia
# Court of Appeals

**Nos. 13-CF-854 & 13-CM-109**

ALAZAJUAN M. GRAY and CLIFTON SMITH,

Appellants,

```
F I L E D
OCT 20 2016
DISTRICT OF COLUMBIA
COURT OF APPEALS
```

v.

**CF2-17021-12 &
CMD-17022-12**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: FISHER and BECKWITH, *Associate Judges*; and NEWMAN, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the matter is remanded with instructions to vacate appellants' convictions for the unarmed robbery of Takai and appellant Smith's conviction for receipt of stolen property and, should the government choose to retry appellants, for further proceedings consistent with this opinion. Appellant Gray's conviction of committing an offense during release ("OCDR") should also be vacated. Gray's sentences for armed robbery and carrying a dangerous weapon ("CDW") must be enhanced. In all other respects, the judgments of the trial court are affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: October 20, 2016.

Opinion by Associate Judge John Fisher.

Opinion, concurring in part and dissenting in part, by Associate Judge Corinne Beckwith.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

FILED 10/20/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Nos. 13-CF-854 and 13-CM-1039

ALAZAJUAN M. GRAY and CLIFTON SMITH, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF2-17021-12 and CMD-17022-12)

(Hon. Herbert B. Dixon, Jr., Trial Judge)

(Argued September 30, 2015                    Decided October 20, 2016)

*Matthew C. Leefer* for appellant Alazajuan Gray.

*Marie L. Park* for appellant Clifton Smith.

*Peter S. Smith*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Philip Selden*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BECKWITH, *Associate Judges*, and NEWMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* FISHER.

Opinion by *Associate Judge* BECKWITH, concurring in part and dissenting in part, at page 41.

FISHER, *Associate Judge*: Appellants Alazajuan Gray and Clifton Smith appeal their convictions for robbing Metro passengers of cellphones on two separate occasions. They primarily contend that the charges stemming from each event should have been tried separately. Because the court should have severed the counts, we reverse appellants' convictions for unarmed robbery on September 28, 2012, and Smith's conviction for receiving stolen property on that same date. We are not persuaded by appellants' remaining arguments, but direct that the judgments be corrected in certain respects.

## I. Factual and Procedural History

### A. The September 21 Armed Robbery

Viewed in a light favorable to the government, the evidence showed that, on Friday, September 21, 2012, around 11:00 p.m., Gerald McIntosh entered the Silver Spring Metro station with his girlfriend and two female friends, Radia Tabur and Michele St. Julien. As the group waited on the platform, three African American men, including appellants Alazajuan Gray and Clifton Smith, approached the women and tried to talk with them. Unsuccessful, Gray made

some crass and insulting remarks to McIntosh before lifting his hands above his head to reveal the butt of a gun in the waistband of his pants.

When the train arrived, McIntosh and his friends separated themselves from appellants and stepped into a different car.  However, when the train reached the Takoma Park station, the three men entered the car where the group was sitting. Gray took a seat behind McIntosh.  Smith stood in front of McIntosh, and said, "[O]h, y'all thought y'all was gonna get away."  On Smith's command, Gray stood up, took the gun out of his pants, keeping it at waist level, and took an iPhone and $20 from McIntosh's pockets.  The train stopped and, as the men left, Smith told McIntosh not to "snitch" or he would "beat [his] ass."  "Scared" and "aggravated," McIntosh heeded the threat and did not report the robbery to the police.

A week later, on September 28, McIntosh encountered appellants once again.  Entering the Fort Totten Metro station around 8:00 p.m., McIntosh noticed Gray and Smith walking towards him on the platform.  Gray asked McIntosh if they could talk.  Scared, and believing he saw Gray flash a gun, McIntosh ran up the escalator and found Station Manager Vinson Bellamy.  Appellants chased McIntosh to the station kiosk.  While Bellamy called the police, Smith opened the kiosk door and asked McIntosh if he was "snitching."  When McIntosh said

"yeah," Smith came into the kiosk and punched McIntosh in the face. Bellamy broke up the fight and appellants fled.

Not long after, Metro Transit Police Officers Leron Elliston, Thomas Leahy, and Syreeta Jackson responded to the scene. After they conducted a show-up procedure, during which McIntosh described and then identified appellants, Officer Elliston arrested Gray and Smith. At trial, the officers described Gray as an African American male with short hair, who, on September 28, was wearing a blue and yellow hat and a "dark blue" or "dark-colored" shirt. The officers described Smith as an African American male with dreadlocks wearing a white T-shirt.

At trial, eyewitnesses McIntosh, St. Julien, and Tabur identified appellants as the men who robbed McIntosh on September 21, and Bellamy identified appellants as the men who chased and attacked McIntosh on September 28. The government also introduced cellular data, which showed a phone registered to Gray had been in the area of the Silver Spring Metro station on September 21 around the time of the robbery, as well as a black and white video, which showed appellants confronting and chasing McIntosh in the Fort Totten Metro station on September 28.

Appellants challenged the eyewitness identifications through the expert testimony of Dr. Steven Penrod, who testified about the accuracy of identifications in hypothetical situations mirroring the facts of this case. Additionally, both appellants testified, claiming they were not present for the September 21 robbery. Gray testified that he was either at home or at work, because he had recently received a court-imposed curfew between "10 p.m. and 6 a.m." when he was released in another Superior Court case. Gray also testified that the eyewitnesses must have confused him with "other individuals" and that his brothers' use of his cellphone might explain the cellular evidence.

Similarly, Smith stated he was not at the Silver Spring Metro station on September 21 but rather at his mother's house or his aunt's house. Based on the time his Metro card was swiped on an A2 bus (the bus he normally takes to his aunt's house), he contended that he could not have made it to the Silver Spring Metro station by the time the robbery occurred.

Smith stated that he chased and punched McIntosh on September 28 because he thought McIntosh was "trying to snitch on me for something I didn't do." Gray said he participated in the chase because he thought the three men were "about to fight."

## B. The September 28 Unarmed Robbery

Around 7:10 p.m., a little less than an hour before Gray and Smith confronted McIntosh at Fort Totten, Katherine Takai boarded a yellow line train at the Pentagon City Metro station. In her train car, she noticed three African American men sitting together. One of them moved closer to her, sitting somewhere behind her. When the Metro doors opened at Gallery Place, that man ripped the phone out of her hands and sprinted out of the car. Takai tried to chase him, but the remaining two men stood in her way, purposefully blocking her attempt to exit the car.

Later that night, Officer Elliston and a Metropolitan Police Department canine unit found Takai's stolen iPhone in a park outside the Fort Totten Metro station – where Elliston had cuffed and detained Smith approximately forty-five to fifty minutes earlier in response to Station Manager Bellamy's call regarding the assault on McIntosh.

Takai was unable to identify the robbers either in a photo array or at trial. However, she testified that the man who took her phone had short hair and was

wearing a light blue shirt. She also said that one of the men who blocked her exit had dreadlocks and was wearing a white T-shirt.

In their testimony at trial, Gray and Smith claimed they did not rob Takai or ride the yellow line that night. Both admitted that they passed through Gallery Place, but Gray claimed he was coming back from his baby's mother's house on the red line and Smith claimed he was traveling from his house on the green line. Both testified that they met on the train and had plans to meet more people in Fort Totten before heading to a party on New York Avenue together. Smith also asserted that he had Takai's phone, not because he stole it, but because, while riding the red line to Fort Totten, he bought it from another young, African American man who offered to sell the iPhone for $50.00.

## C. The Verdicts

Among other offenses, the jury found both appellants guilty of one count of armed robbery, based on the September 21, 2012, robbery of McIntosh, and one count of unarmed robbery, based on the September 28, 2012, robbery of Takai.

## II. Joinder/Severance

Appellant Smith argues that the September 21 armed robbery charges and the September 28 unarmed robbery charges were improperly joined under Rule 8 (b).[1]  Both appellants argue that, even if proper, the joinder was prejudicial, and the court abused its discretion in denying their motions to sever.  Finally, Gray argues that the contempt charge should have been tried separately.

### A.  Joinder of the Robbery Charges

Two or more defendants may be charged in the same indictment "if they are alleged to have participated . . . in the same series of acts or transactions constituting an offense or offenses."  Super. Ct. Crim. R. 8 (b).  The government argues that the robberies were a joinable "series of acts" because "the offenses were so closely connected 'that there [was] necessarily a substantial overlap in proof of the various crimes and it would [have been] difficult to separate proof of

---

[1]  Appellants do not argue that the trial court should have severed the charges against Smith from the charges against Gray, and Gray does not challenge the initial joinder of offenses.

one from the other.'" Brief for Appellee at 20 (quoting *Settles v. United States*, 522 A.2d 348, 352 (D.C. 1987)).[2]

There undoubtedly was *some* overlap in proof (centering on the arrest of appellants on September 28), but the robberies at issue occurred on different dates, were largely self-contained events, had different victims, and were proven by different witnesses. There was no common *modus operandi*. To tell the story of the unarmed, September 28 robbery, the government would not need to show that McIntosh was robbed on the 21st or confronted again by his robbers on the 28th. It would suffice to show that appellants were together less than an hour after the robbery of Takai, they matched the victim's descriptions, and one of them possessed the stolen iPhone.

Similarly, although McIntosh's second encounter with appellants was an integral part of the proof that they robbed him on September 21, there was no need, for those purposes, to reveal that Smith possessed the cellphone recently stolen

---

[2] Elaborating on Rule 8 (b), our decisions have held that multiple offenses are properly joined if they are "part of a common scheme or plan, involving the same place, a short period of time, and a similar modus operandi, so that there is *necessarily* a substantial overlap in proof of the various crimes and it would be difficult to separate proof of one from the other." *King v. United States*, 74 A.3d 678, 684 (D.C. 2013) (emphasis added).

from Takai. We thus have serious doubts that the robberies in this case were properly joined. Nevertheless, we need not decide this question because the trial court should have severed the robbery offenses under Rule 14.

## B. Severance of the Robbery Charges

Even when joinder is proper under Rule 8 (b), "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses . . . , the court may order . . . separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires." Super. Ct. Crim. R. 14. *See Zafiro v. United States*, 506 U.S. 534, 538 (1993). However, "a motion to sever [joined offenses] will be granted only where the evidence would not be mutually admissible at separate trials, or the evidence of the multiple charges is likely to be amalgamated in the jury's mind into a single inculpatory mass." *Bailey v. United States*, 10 A.3d 637, 643 (D.C. 2010) (citation omitted).

The trial court recognized that not all of the evidence would be mutually admissible in separate trials, but nonetheless denied appellants' motions to sever. We conclude that *none* of the evidence of what occurred on September 21 was admissible to prove the identities of the September 28 robbers or to place the

September 28 robbery in an understandable context. Although the assault of McIntosh and the arrest of appellants on the 28th would be admissible in separate trials, the benefits to judicial economy achieved by a joint trial were far outweighed by the prejudice to appellants.

### 1. Identity Evidence

Evidence of one crime is generally inadmissible in the trial of another because of the substantial risk that the jury will improperly infer the defendant's propensity to commit crime. However, "other crimes" evidence may be admissible to help prove who committed the crime on trial if it promises "'a real contribution in the process of proof.'" *Easton v. United States*, 533 A.2d 904, 906 (D.C. 1987) (quoting *Bittle v. United States*, 410 A.2d 1383, 1387 (D.C. 1980)). Such evidence must show that there is "'a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinctive facts.'" *Id.* at 907 (quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964)).

However, the similarities between crimes must go beyond the commonplace and remain meaningful even when measured against the differences. *Tornero v. United States*, 94 A.3d 1, 13 (D.C. 2014). In *Easton*, we held that "[r]obberies of

middle-aged cab drivers during evening hours" were not especially unusual occurrences, nor was the "use of a sharp instrument in such a robbery." 533 A.2d at 909. Other shared features of the attacks, "including the ruse of not having enough money for the fare," did not persuade us to hold that there was a "reasonable probability" that the robberies were committed by the same person. *Id.*

In this case, the government touts six similarities between the September 21 and September 28 robberies:

> (1) the robbers initially were traveling on the Metro with a group, and then broke away from the group; (2) a robber fitting Gray's description sat behind the victim, and a robber fitting Smith's description sat in front of the victim; (3) the robber fitting Smith's description gave instructions to the robber who fit Gray's description; (4) the robber fitting Gray's description stole property from the victims as the train was between stops; (5) the primary objective of each of the robberies was to steal the victim's iPhone; and (6) the robbers fled by running from the Metro train at the next stop.

The government asserts that these points of similarity create a reasonable probability that Gray and Smith committed both robberies, rendering the evidence mutually admissible to establish identity.

It is doubtful that we should even consider this argument. The government assured the trial court that it was not planning "to use the similarities of either robbery to prove the identity of the assailants in the other robbery." But even if we consider the merits of its current argument, the government's concession at trial was prudent. Just as "robberies of middle-aged cab drivers during evening hours" are too commonplace to be "unusual and distinctive," so too, regrettably, are robberies of iPhones from Metro passengers. That the robbers stole the iPhones between stops and then (predictably) left the train at the next stop hardly changes this analysis. Moreover, the record does not substantiate certain similarities claimed by the government.

There is, for instance, no clear evidence that the robbers on September 21 "fled" or "ran" from the Metro, or that the robbers on September 28 were "traveling with a group and then broke away from the group." There is also nothing in Takai's testimony that suggests a robber fitting Smith's description sat in front of Takai and gave instructions to the robber fitting Gray's description. Finally, while the September 21 robbers tried to humiliate McIntosh and then take "whatever" he had in his pockets, it is not clear from the record that they knew McIntosh had a cellphone before they robbed him.

Basic differences overwhelm any remaining similarities. The September 21 robbery was armed, accomplished through intimidation, and ended when the robbers threatened McIntosh "not [to] snitch." By contrast, the September 28 robbery was unarmed, accomplished through stealthy snatching, and ended in a short, fruitless chase. On September 21, two robbers[3] targeted McIntosh, a young male traveling with three female friends. On September 28, three robbers[4] targeted Takai, a young female, traveling alone.

The evidence of the September 21 robbery thus would not have been admissible to prove identity in a separate trial of the September 28 robbery, and it unfairly bolstered the government's comparatively weaker effort to prove that appellants were the ones who robbed Takai.

---

[3] McIntosh said that a third man was present, but he did not describe him participating in the robbery. In opening statement, the prosecutor said that the third man "did not play an active role, but he was present that night."

[4] Takai described each man playing a specific role. One snatched her phone, and the other two blocked Takai from exiting the Metro car in pursuit.

## 2. Understandable Context

Evidence of another crime may still be admitted if it is "necessary to place the charged crime in an understandable context." *Johnson v. United States*, 683 A.2d 1087, 1098 (D.C. 1996) (en banc). But the details of the September 21 robbery do not help explain any aspect of the September 28 crime. Evidence of the earlier robbery may help explain why McIntosh summoned the police who stopped Gray and Smith on September 28 (and found Takai's phone), but revealing that McIntosh had been robbed was not necessary to place the September 28 robbery of Takai in an understandable context. Ample context would have been provided simply by explaining that appellants had chased, and Smith had assaulted, McIntosh on September 28. The arrest of Smith for that crime led to the discovery of Takai's cellphone.

## 3. Prejudice

Finally, the probative value of the evidence of the September 21 robbery was "substantially outweighed by the danger of unfair prejudice." *Jones v. United States*, 27 A.3d 1130, 1147 (D.C. 2011) (citation omitted). Had the September 28 robbery been tried separately, the government would have presented Takai's

narrative of the offense, the video of appellants together at Fort Totten later that night, testimony that appellants had been arrested there, and proof that Smith possessed Takai's phone.[5] The jury would have learned that Takai could not identify either appellant. Especially in light of the conflicting evidence describing Gray[6] and the rather generic description of Smith,[7] this does not constitute sufficiently powerful evidence of the appellants' guilt to overcome the prejudice from a joint trial.

Once admitted, the much stronger evidence of the September 21 robbery (three eyewitnesses to the robbery, cellular data, and video evidence of the "sequel" attack on McIntosh) would necessarily alter the jury's perception of the September 28 robbery. It would look less like a simple phone snatching and more

---

[5] Although at trial Gray and Smith admitted passing through Gallery Place on the 28th and Smith admitted possessing Takai's stolen iPhone, they might have chosen not to testify if the robbery charges had been severed, especially if the September 28 robbery had been tried first.

[6] Takai described the robber as an African American man with short hair wearing a light blue T-shirt. By contrast, the officers described Gray as wearing a hat and a dark blue or dark-colored shirt. Through his own testimony and that of a corroborating witness, Gray also pointed out that Takai did not notice the tattoos on his forearms.

[7] Takai described one of the African American men as having dreadlocks and wearing a white T-shirt. The Metro police officers testified that Smith had dreadlocks and a white T-shirt.

like the work of an experienced gang of robbers. The details of the McIntosh robbery strongly suggested criminal propensity, rather than being fairly probative of identity. Instead of making "a real contribution in the process of proof," *Easton*, 533 A.2d at 906, the evidence of the separate robbery was "likely to be amalgamated in the jury's mind into a single inculpatory mass." *Bailey*, 10 A.3d at 643.[8]

Because the evidence of the September 21 robbery should not have been admitted as identity or context evidence, and that error was unfairly prejudicial to appellants, we vacate their convictions for the September 28 robbery, and Smith's related conviction for receiving stolen property, and remand those charges for further proceedings. However, we need not reverse the appellants' convictions for the September 21 armed robbery. The government presented four eyewitnesses (three who watched the appellants rob McIntosh and one who saw appellants attack and chase him), cellular data suggesting Gray was present at the Silver

---

[8] Although the government largely presented its evidence of the two robberies separately and distinctly, the prosecutor began his opening statement by explaining that "[o]ver the course of one week in September of 2012, the defendants in this case committed a series of robberies." Furthermore, the trial court did not carefully instruct the jury to consider the evidence separately as to each offense. *See Cox*, 498 A.2d at 237 n.4 (quoting model criminal jury instructions for joined offenses).

Spring Metro on September 21, and video evidence of the "sequel" attack on McIntosh on September 28. The error in denying severance was harmless as to this offense.

### C. Failure to Sever the Contempt Charge Against Gray

To prove contempt, the government introduced a stipulation that, "On September 17[th], 2012, Alazajuan Gray was released in a D.C. Superior Court case," where he promised to abide by a curfew "between 10 p.m. and 6 a.m." The jury heard neither the nature nor the seriousness of the pending charge, and the government mentioned the prior case only as necessary to prove contempt. In its final instructions, the court cautioned the jury that Gray's stipulation to his curfew hours "was admitted for no other reason" than to prove one of the elements of contempt—that Gray had to observe a court-ordered curfew.

Moreover, Gray openly testified about the curfew, using it to support his alibi defense. Gray stated he knew he was at home and not at the scene of the robbery on September 21 because it would have been foolish to risk getting caught violating his curfew. Finally, the jury properly learned that Gray had a criminal record when he was impeached with his prior theft conviction during cross

examination.  Because Gray was not unfairly prejudiced, the trial court did not abuse its discretion by denying his motion to sever the contempt charge.[9]

### III.  Aiding and Abetting Armed Robbery

Appellant Smith was convicted of the September 21 armed robbery of McIntosh under an aiding and abetting theory of criminal liability.  Smith now complains that the trial court failed to instruct the jury that, to be guilty of armed robbery, an unarmed aider and abettor must have had "actual knowledge" that the principal offender was armed.  *Robinson v. United States*, 100 A.3d 95, 106 (D.C. 2014).  Appellant did not raise this objection at trial.

---

[9]  There is no merit to Gray's alternative argument that the contempt charge should not have been tried by the jury.  The government had discretion to charge Gray under D.C. Code § 11-944 (2012  Repl.) rather than D.C. Code § 23-1329 (2012  Repl.).  *See Caldwell v. United States*, 595 A.2d 961, 965-66 (D.C. 1991) (citation omitted) (holding the two contempt statutes "merely provide alternative means of prosecuting" contempt for a violation of a condition of pretrial release).  Due to the penalty authorized by § 11-944, that charge was presumptively triable by a jury.  Moreover, a defendant cannot waive a jury trial without the approval of the court and the consent of the prosecuting officer.  Super. Ct. Crim. R. 23.  Although the government has not satisfactorily explained why it agreed to a non-jury trial of the OCDR allegations but refused to consent to a non-jury trial of the contempt charge, we are satisfied that appellant was not prejudiced by the fact that the jury adjudicated this offense.  *See infra* text accompanying note 13.

The court instructed that, along with the other elements of armed robbery, the government had to prove that "the defendant was armed with or had readily available a firearm." The court also instructed that an aider and abettor must have "personally acted with the [same] intent as defined in" the instructions on the elements of each offense.

If the principal was armed, he necessarily would have had "actual knowledge" that he had armed himself. The court reinforced this logical requirement, explaining that to prove Gray was guilty of PFCV (that is, possession of a firearm during the robbery), the government was required to show that he possessed the firearm "voluntarily and on purpose and not by mistake or accident." Although there are distinctions between intent and knowledge, in this context it is most unlikely that the jury failed to understand that Smith, as the aider and abettor, must have also known that the principal, Gray, had armed himself.

It undoubtedly would be clearer to add that the aider and abettor needed to have "actual knowledge" that his accomplice was armed with a weapon, but the instructions given sufficiently conveyed this requirement and did not affect Smith's "substantial rights" or seriously affect the "fairness, integrity or public

reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 726, 736 (1993). Appellant thus has not demonstrated that plain error occurred.

Moreover, the government presented sufficient evidence to prove beyond a reasonable doubt that Smith knew Gray was carrying a firearm. In Smith's presence, on the platform in the Silver Spring Metro station, Gray lifted his hands above his head, revealing the butt of a gun in his waistband. Later, in the subway car, Smith commanded Gray to take what McIntosh had in his pockets, and Gray displayed the gun to do so.

## IV. Restrictions on Expert Testimony

"[E]xpert testimony is admissible to help the jury to do its work and not to do the jury's work for it." *Hager v. United States*, 856 A.2d 1143, 1147 (D.C. 2004) (internal quotation marks omitted). The trial court permitted Dr. Penrod to explain general principles of psychology that might affect the accuracy of eyewitness identifications, leading research on factors impacting eyewitness reliability, and the results of experimental studies. The court also allowed Dr. Penrod to comment on hypothetical scenarios that closely mirrored the circumstances of the identifications in this case. However, it prohibited questions

which essentially asked Dr. Penrod to comment on the accuracy of those identifications.

For example, during the opening statement for appellant Smith, the court clarified that Dr. Penrod could not "comment on a witness'[s] ability to identify [the defendants,]" but he could testify generally about the percentage of times that people make an incorrect identification when presented with "individuals whom they've been given some pre-notice are supposedly the persons they're sought to identify[.]" Similarly, the court explained that Dr. Penrod could not answer the question "What is your opinion of the accuracy of [Ms. Tabur's] identification?" However, he could discuss what research had been done with respect to witnesses making their first identification a long time after first seeing the perpetrator. Although the court later sustained several objections, this usually was because the defense attorney was unable to successfully rephrase his question into an appropriate hypothetical.

Dr. Penrod's testimony explained percentages, probabilities, and statistics that would help the jury evaluate eyewitness testimony, but could not determine whether the identification made by any particular eyewitness was accurate. He also explained, among other things, the concept of weapon focus, the effects of

stress or fear and the amount of time during which the witness saw an assailant, the accuracy of cross-racial identifications, the correlation between the confidence of a witness and the accuracy of her identification, and the impact of the amount of time that passes before an identification is made.

Given the strong evidence confirming the eyewitness identifications in the robbery of McIntosh, any erroneous curtailment of Dr. Penrod's testimony did not affect appellants' substantive rights. Thus, there was no abuse of discretion. *See Johnson v. United States*, 398 A.2d 354, 367 (D.C. 1979) (only when "the exercise of discretion was in error" *and* "the impact of that error requires reversal" do "we hold that the trial court 'abused' its discretion").

## V. Restrictions on Defense Testimony

Gray next argues that the trial court erred by restricting the admission of photographic evidence purportedly showing how similar Gray and one of his brothers looked, and Smith contends the trial court erred by precluding his testimony that he was not charged with the September 21 armed robbery until December 2012.

During the direct examination of Gray's father, Calvestri Clark, the trial court granted Gray's counsel time to look for a photograph of Cooper Gray to show to Clark, but, upon inquiry from the prosecution, the court asked Gray's counsel to explain the purpose of introducing the photograph. Gray's counsel stated, "That's the other son." The government then objected and the trial court sustained the objection. It is not clear what the basis of the objection was or on what grounds it was sustained. Regardless, Gray's counsel did not request an explanation for the ruling and did not pursue the chance to authenticate the photo during his client's testimony the next day.

Gray asserts that the photograph was relevant to his theory of defense – that McIntosh and the other eyewitnesses mistook Gray for "other individuals who may have committed these crimes." For the first time on appeal, he presents a *Winfield* argument, claiming that "it may have been Cooper Gray who robbed Gerald McIntosh on September 21, not Alazajuan Gray." However, Gray did not plainly raise a third party perpetrator defense at trial, much less satisfy the requirements of *Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (en banc).

Even so, through the testimony of Calvestri Clark, Gray established that he looked similar to his brother Cooper. He also had an opportunity to cross examine

the eyewitnesses who identified him and to present favorable expert testimony on the accuracy of eyewitness identifications. Given the photograph's minimal probative value and the fact that it would have been cumulative of Calvestri Clark's testimony that his sons looked alike, we are satisfied that the trial court did not abuse its discretion in excluding the photograph.

Smith contends that he should have been allowed to establish that the government did not charge him with robbing McIntosh until December in order to explain why he did not remember precisely where he was on September 21 and why the defense did not retrieve video evidence from the bus he might have been riding that night. However, the trial court found that asking Smith about the delay in charging would be prejudicial to the government because it would "suggest[] the government is [unfairly] adding additional charges on the case, which is not relevant for this jury." If the trial court had permitted this line of questioning, the government would have been allowed to cross-examine Smith on the *Gerstein* proffer, filed when he first appeared in court on September 29. The government claimed that this proffer put Smith on notice that he *was* a suspect in the McIntosh robbery, and that Smith should therefore have been prepared to seek out any videos helpful to his defense. Presumably, the government would also have been allowed

to explain that the grand jury often (and quite properly) adds charges well after a suspect's arrest.

To avoid admitting evidence that would have been "unfairly prejudicial . . . to *both* sides[,]" and which would have inevitably muddled the issues before the jury, the trial court chose instead to preclude the government from mentioning that there was no video evidence to support Smith's alibi. Additionally, while Smith did not remember exactly where he was on September 21, he had the opportunity to testify that he was either at home or at his aunt's house and to support this contention with corroborating evidence.

We therefore hold that the court did not arbitrarily restrict appellants' right to present a meaningful defense, but rather deliberately weighed the probative value of the evidence against "factors such as unfair prejudice, confusion of the issues, . . . [and] the potential to mislead the jury." *Johnson v. United States*, 960 A.2d 281, 293, 295 (D.C. 2008). There was no abuse of discretion.

## VI.  Admission of Government Testimony

Gray argues the court erred by allowing Officer Jackson to recount what McIntosh told her on the night of September 28, claiming her testimony was inadmissible hearsay.  Portions of what McIntosh told Officer Jackson before and during the show-up procedures were non-hearsay identifications of appellants,[10] and some of the testimony was admissible as "context" to make McIntosh's identifications understandable to the jury. *(Thomas) Johnson v. United States*, 820 A.2d 551, 559 n.4 (D.C. 2003).  Other portions of the testimony contained more detail than was necessary, but the excess detail was harmless because it merely echoed McIntosh's previous testimony, which had already been corroborated by the eyewitness testimony of St. Julien and Tabur.

## VII.  Sufficiency of the Evidence

Gray contends there was insufficient evidence to convict him of the September 28 robbery and of carrying a dangerous weapon ("CDW") on that day. Smith argues there was insufficient evidence to convict him of aiding and abetting

---

[10]  McIntosh identified appellants, testified at trial, was subject to cross-examination, and made his statements to Officer Jackson soon after perceiving the appellants.  *See* D.C. Code § 14-102 (b)(3) (2012 Repl.).

the September 21 armed robbery (an issue we have addressed above) and of obstruction of justice.

"We review a challenge for sufficiency of the evidence 'in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence.'" *Terry v. United States*, 114 A.3d 608, 616 (D.C. 2015) (quoting *Gathy v. United States*, 754 A.2d 912, 917 (D.C. 2000)). "Thus, 'it is only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the trial court may properly take the case from the jury.'" *Id.* (quoting *Gathy*, 754 A.2d at 917) (internal alteration omitted).

## A. September 28 Robbery (Gray)

While there was not "overwhelming" evidence of Gray's guilt, a reasonable jury could conclude that he robbed Takai on September 28.[11] Gray matched

---

[11] Although we are overturning Gray's conviction for the September 28 robbery on other grounds, we address his sufficiency argument because "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the

(continued…)

Takai's description,[12] admitted to being at the scene of the robbery (Gallery Place) twice that night, and later traveled with Smith, a man who matched Takai's description and possessed Takai's iPhone. Additionally, the video of the two men at Fort Totten portrays more than simultaneous presence. Rather, it (and the related testimony of various witnesses) shows that they were collaborating in criminal activity (chasing McIntosh to prevent him from "snitching"). Moreover, the jury knew that Gray and Smith had been accomplices in a similar robbery a

---

(…continued)
prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States*, 437 U.S. 1, 11 (1978).

[12] Viewed in the light most favorable to the government, the evidence shows that Gray matched Takai's description of an African American male with short hair and a blue shirt. Although Takai said the robber's shirt was "light blue," one of the responding officers said Gray's shirt was "dark blue," and another officer said the shirt was "dark-colored," the jury knew the conditions under which each witness would have seen Gray (such as where each witness saw him, for how long, and under what levels of stress). The jury also saw the very shirt Gray was wearing that night because it was entered into evidence, and the jury watched a black and white video of Gray wearing the T-shirt. Based on this evidence, the jurors resolved any discrepancies about the color of Gray's T-shirt in favor of the government, and the evidence permitted them to do so.

Finally, although Takai did not notice Gray's tattoos or hat, neither McIntosh nor the officers who interacted with Gray on September 28 noticed Gray's tattoos, and Bellamy did not remember Gray wearing a hat. It would therefore be permissible for a jury to give little weight to the fact that Takai did not remember the tattoos or hat when other witnesses who spent more time looking at and interacting with appellant did not notice them either.

week earlier.[13]  Considered as a whole, the evidence was sufficient to identify Gray

as Smith's accomplice on September 28.[14]

## B.  CDW (Gray)

When the police arrested Gray on September 28, they found a switchblade

knife in his possession; Gray admitted at trial that he carried that knife in his hand

when he approached McIntosh.[15]  He nevertheless contends that the government

failed to present sufficient evidence from which a reasonable jury could find that

he carried a "deadly or dangerous weapon."  *See* D.C. Code § 22-4504 (a) (2012

Repl.).

---

[13]  For present purposes, "[w]e evaluate sufficiency based on the evidence that was before the trial court, even if it was admitted erroneously." *Best v. United States*, 66 A.3d 1013, 1019-20 (D.C. 2013) (citing *Lockhart v. Nelson*, 488 U.S. 33, 40-42 (1988)).

[14]  Our dissenting colleague suggests that the judges in the majority are drawing an improper propensity inference.  Not so.  We are, rather, taking into account all the direct and circumstantial evidence that tends to prove the identity of Smith's accomplice on September 28.

[15]  Although Gray committed the CDW offense on September 28, the offense is based on Gray's confrontation with McIntosh and is therefore not affected by our severance analysis.

Some objects, such as a hammer or a screwdriver, have benign uses, and to establish the offense of CDW, the government must prove "that the defendant intended to use the [potentially benign] object in question *as* a dangerous weapon." *Wright v. United States*, 926 A.2d 1151, 1155 (D.C. 2007) (emphasis in original). However, because a switchblade is "nothing but a dangerous weapon," we need not rely upon the evidence that Gray carried the knife in his hand as he approached McIntosh to prove his intent.

Addressing a similar situation in *Wright*, we held that "since the plain language of D.C. Code § 22-4514 flatly prohibits the possession of sawed-off shotguns, the additional act of carrying such a weapon, if it can be concealed, as a matter of law evidences appellant's unlawful intent as there are no lawful uses for such an item." *Id.* (footnote omitted). Switchblades likewise are listed in § 22-4514 (a), which prohibits the possession of enumerated weapons without regard to intent. *See Reed v. United States*, 584 A.2d 585, 588 (D.C. 1990) ("[C]ertain objects are weapons by design, for instance . . . a switchblade . . . ."). As all switchblade knives are inherently dangerous weapons and Gray admitted he was carrying one, the evidence was sufficient to support his conviction for carrying a dangerous weapon.

### C. Obstruction of Justice (Smith)

To prove obstruction of justice, as charged here, the government had to establish that Smith "harass[ed] Gerald McIntosh, with intent to hinder, delay, prevent, and dissuade Gerald McIntosh from reporting to law enforcement the commission of and any information concerning, a criminal offense." *See* D.C. Code § 22-722 (a)(3). Based on his threat to McIntosh on September 21 and his assault of McIntosh on September 28, Smith was convicted of obstructing justice.

Smith first argues that he did not "harass" McIntosh within the meaning of the statute because there is insufficient evidence that his verbal threat on September 21 not to "snitch" "annoyed, alarmed, or caused substantial emotional distress in the person." *Wynn v. United States*, 80 A.3d 211, 218 (D.C. 2013) (quoting *Black's Law Dictionary* (9th ed. 2009)). This argument is without merit. At trial, McIntosh specifically said he initially heeded the threat not to "snitch" because he was "scared" and "aggravated."

Smith next argues that the government failed to prove he had the necessary *mens rea* to "hinder" McIntosh from reporting the commission of a crime when he punched him in the station kiosk. Smith states that punching McIntosh in the kiosk

would only increase the likelihood that the police would be called and subsequently learn about the September 21 robbery. However, the statute does not require a defendant to successfully prevent the victim from reporting a crime to authorities. Rather, it requires that the defendant "harass[] another person with the *intent* to hinder . . . ." D.C. Code § 22-722 (a)(3) (emphasis added). Smith had the requisite intent and openly admitted at trial that he punched McIntosh because he "wanted to make sure [McIntosh] wasn't lying on [him]" and because he was concerned that McIntosh was "going to go to transit" to say that Smith robbed him. A reasonable jury could therefore conclude that Smith punched McIntosh to "hinder, delay, prevent, or dissuade" McIntosh from reporting a crime to the authorities.

Smith makes three additional arguments attacking his obstruction of justice conviction. He complains, for the first time on appeal, that the trial court failed to instruct the jury on the legal definition of "harass." However, "[a] court need not give an instruction defining a term unless it has a technical meaning so different from its ordinary meaning that the jury, without further explanation, would misunderstand its import in relation to the factual circumstances." *Wilson v. United States*, 785 A.2d 321, 327 n.8 (D.C. 2001) (citation omitted). The standard definition of "harass" comports with its ordinary meaning and fits these

circumstances perfectly. Red Book Instruction No. 6.101C defines "harass," in part, as "to threaten, intimidate, or use physical force against a person . . . ." Standardized Criminal Jury Instructions for the District of Columbia (the "Red Book"), No. 6.101C (5th ed. rev. 2013). The jury convicted Smith of corresponding charges of threats and assault, offenses which clearly satisfy the definition of "harass."

Smith therefore was not prejudiced by the omission of this instruction. There is no persuasive evidence that the jury misunderstood the term harass, "could not properly apply the term to the facts[,]" or found guilt based on something that did not rise to the level of harassment. *See Atkinson v. United States*, 121 A.3d 780, 786 (D.C. 2015) (failure to define "course of conduct" not plain error).

Smith next argues the trial court constructively amended the indictment to charge two counts of obstruction of justice instead of one. The indictment alleged one count of obstruction of justice that encompassed two separate incidents—the threat to McIntosh on September 21 and the assault of McIntosh on September 28. The jury found in a special verdict that both the threat and the assault had been proven, but the judge expressly noted at sentencing that "Mr. Smith was found

guilty of . . . *one* charge of obstructing justice[.]" When instructing the jury, the judge had emphasized this point, saying, "you will have to consider that *one* charge as it relates to two separate dates, September 21ˢᵗ, 2012, and September 28ᵗʰ, 2012. But there's only *one* charge of obstruction of justice[.]" Contrary to appellant's argument, the sentence of seventy-two months (six years) does not represent an improper division of a single count of obstruction of justice into two separate counts for sentencing purposes. The six-year term is well below the maximum sentence of "not more than 30 years" for one obstruction offense, and it does not represent, as appellant suggests, the "mandatory minimum required for a conviction of two counts of obstruction." D.C. Code § 22-722 (b).

Finally, the trial court did not commit reversible error by declining to include Smith's theory of the defense instruction (that Smith "did not *knowingly attempt to hinder* Gerald McIntosh from reporting a legitimate crime to the police"). A defendant is "not entitled to an instruction that does no more than rehearse or summarize the defense evidence, because this would give special emphasis to the defendant's testimony." *Payne v. United States*, 932 A.2d 1095, 1100 (D.C. 2007) (quoting *Durham v. United States*, 743 A.2d 196, 200 n.5 (D.C. 1999)). The defense theory was clearly presented to the jury during Smith's testimony and through his counsel's closing argument.

## VIII.  Merger of Convictions

Gray contends that two of his three convictions for violating D.C. Code § 23-1328 (a)(1) (committing an offense during release ("OCDR")) should merge under the Double Jeopardy Clause because those offenses were both committed on September 28.[16]  We disagree with this argument, but direct that the judgment be reformed to reflect that § 23-1328 does not create a separate offense, but requires, rather, that an enhanced sentence be imposed for any offense committed while on release.  *Eady v. United States*, 44 A.3d 257, 261 (D.C. 2012); *Tansimore v. United States*, 355 A.2d 799, 803 (D.C. 1976).

We have previously held that "the imposition of a § 23-1328 enhancement for each of [a defendant's] separate, non-merged offenses does not violate the Double Jeopardy Clause."  *Sanders v. United States*, 809 A.2d 584, 606 (D.C. 2002).  Robbery and CDW are separate offenses which do not merge because each requires proof of an element the other does not.  *Compare* D.C. Code § 22-2801 (robbery requires proof of taking), *with* § 22-4504 (a) (CDW requires carrying a dangerous weapon); *see also Byrd v. United States*, 598 A.2d 386, 389 (D.C. 1991)

---

[16]  All three OCDR charges were tried by the court, not the jury.

(en banc) (test for merger). Moreover, these offenses were committed at different times and in different locations. As the underlying offenses do not merge, the Double Jeopardy Clause does not prohibit enhancement of the sentences for both.

However, the application § 23-1328 (a)(1) should not have resulted in *convictions*. We therefore remand for the trial court to vacate those convictions. and, in the reformed judgment and commitment order, reflect the required OCDR enhancements as part of the sentences for armed robbery and CDW. *See Washington v. United States*, 122 A.3d 927, 929 n.2 (D.C. 2015) ("On remand, to implement the enhancement, the trial court must add a separate consecutive sentence to each underlying conviction."). Because we have overturned Gray's conviction for the September 28 robbery of Takai, there is no basis for applying an OCDR enhancement.[17]

## IX. Smith's Sentencing Arguments

---

[17] We have also overturned appellant Smith's conviction for receiving stolen property ("RSP"). Thus, while appellant Smith argues, and the government agrees, that Smith cannot remain convicted of both RSP and committing robbery on September 28, that argument is moot. We reject Smith's argument that his conviction for threats to do bodily harm should merge with his conviction for obstruction of justice. *Ball v. United States*, 429 A.2d 1354, 1359-60 (D.C. 1981).

In the first of four sentencing arguments, Smith contends that the trial court erred by ordering him to register as a gun offender, but the trial court's order was proper. D.C. Code § 7-2508.01 defines a gun offender as "a person convicted at any time of a gun offense in the District," and a gun offense includes "use . . . of a firearm under Chapter 45 of Title 22." D.C. Code § 7-2508.01 (2)-(3). A conviction of armed robbery is a compound offense that violates D.C. Code § 22-2801 and § 22-4502. Although he was convicted as an aider and abettor, Smith committed a gun offense under Chapter 45 of Title 22. *See* D.C. Code § 22-1805 (2012 Repl.) ("In prosecutions for any criminal offense all persons . . . aiding or abetting the principal offender shall be charged as principals and not as accessories[.]").

When imposing Smith's sentence, the court noted that this was not his first offense. Appellant now asserts that "[w]ithout § 23-111 compliance, the trial court was statutorily barred from considering any prior offenses at sentencing." His argument betrays a fundamental misunderstanding of the statute.

Section 23-111 declares that "[n]o person who stands convicted of an offense under the laws of the District of Columbia shall be sentenced to *increased* punishment *by reason of one or more previous convictions*" unless specified

procedures are followed. D.C. Code § 23-111 (a)(1) (emphasis added). This statute only applies when enhanced penalties are imposed by virtue of prior convictions. *See Brown v. United States*, 474 A.2d 161, 163 (D.C. 1984); *Morris v. United States*, 436 A.2d 377, 378 (D.C. 1981). It does not restrict a judge's consideration of a defendant's prior criminal record when sentencing him within the normal range. *See generally Powers v. United States*, 588 A.2d 1166, 1169 (D.C. 1991) ("A trial judge, when imposing sentence, may conduct an inquiry broad in scope, largely unlimited as to the kind of information received and the source from which it is received.") (citation omitted).

Smith did not receive increased punishment by reason of prior convictions. The sentences for armed and unarmed robbery fell within the normal sentencing ranges for those offenses.[18] Additionally, the trial judge need not follow § 23-111 procedures before applying OCDR enhancements, which are not imposed because of prior convictions but for committing crimes while on release. Thus, section 23-111 did not apply to Smith's sentence.

---

[18] Any person convicted of violating D.C. Code § 22-2801 (robbery) "shall suffer imprisonment for not less than 2 years nor more than 15 years." The court sentenced Smith to four years for the robbery committed on September 28. Section 22-4502 (committing a crime while armed) subjects *first* offenders to a term of not less than five years and up to thirty years for committing a robbery while armed with a firearm. The court sentenced Smith to seven years for the armed robbery committed on September 21.

Smith next argues that the trial court did not realize it had the discretion to impose a D.C. Youth Rehabilitation Act ("DCYRA") sentence under D.C. Code § 24-903 (2012 Repl.). His argument fails to acknowledge the record. The court expressly stated that it had "reviewed the youth study" before choosing not to sentence him under the DCYRA. *See Veney v. United States*, 681 A.2d 429, 433 (D.C. 1996) (holding "an adult sentence may be imposed if the record reflects the judge was aware of the availability under the Act of youth offender treatment, that he considered the rehabilitative option, and that he rejected it"). The trial court's expression of regret in no way signals a belief that it lacked discretion to sentence under the DCYRA.

Finally, Smith contends the trial court erred by not "assuring itself" that the information upon which Smith's sentences were based was reliable and accurate. We are satisfied the court did not abuse its discretion in sentencing the appellant, because even if there were mistakes in the government's Memorandum in Aid of Sentencing, the burden rests on the defendant to show the information was *materially* false or misleading and that the sentence was *based* on that information. Smith has not successfully shown either.

## X. Conclusion

We remand with instructions to vacate appellants' convictions for the unarmed robbery of Takai and Smith's conviction for receipt of stolen property and, should the government choose to retry appellants, for further proceedings consistent with this opinion. Gray's OCDR convictions should also be vacated. As explained above, Gray's sentences for armed robbery and CDW must be enhanced. In all other respects, the judgments of the trial court are affirmed.

*It is so ordered.*

BECKWITH, *Associate Judge*, concurring in part and dissenting in part: No witness ever identified Alazajuan Gray as one of the men who robbed Katherine Takai, and innumerable young black men on the Metro that day would have shared the traits that Mr. Gray himself shared only roughly with Ms. Takai's description of the robbers. I am unwilling to conclude that the additional evidence that Mr. Gray was hanging out with—and causing trouble with—one of the other robbers an hour later and miles away from the Takai robbery and that Mr. Gray a week earlier committed a very different kind of robbery with this other robber renders the evidence sufficient to support his conviction. So while I join the court's

opinion in every other respect, I dissent from its holding that the evidence was sufficient to convict Mr. Gray of robbing Ms. Takai on September 28, 2012.

Review for sufficiency of the evidence "is deferential, but it is not a rubber stamp." *Swinton v. United States*, 902 A.2d 772, 776 n.6 (D.C. 2006). As this court has explained, "[p]roof beyond a reasonable doubt is not merely a guideline for the trier of fact; it also furnishes a standard for judicial review . . . ." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc). We therefore have an obligation to decide whether the evidence is "strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt." *Id.*

While a reasonable jury could have found beyond a reasonable doubt that Mr. Gray's codefendant, Clifton Smith, robbed Ms. Takai,[1] the evidence connecting Mr. Gray to the crime was significantly weaker. It consisted only of (1) Mr. Gray's partial match to Ms. Takai's vague description of one of the three people who robbed her, (2) Mr. Gray's admission that he passed through the busy Gallery Place transfer station on the night of the robbery, and (3) Mr. Gray's

---

[1] Not only did Mr. Smith match Ms. Takai's description of one of the three people who stole her cellphone, but Mr. Smith also admitted that he possessed Ms. Takai's phone on the night of the robbery, and the phone was later recovered at the location where Mr. Smith was arrested.

association with Mr. Smith and participation with Mr. Smith in other criminal activity on the night of the robbery and a week earlier.

Ms. Takai described the people who robbed her at the Gallery Place station as three young black men.[2]  One of the men—who, based on other evidence offered at trial, was likely Mr. Smith—had dreadlocks and a dark complexion and "was dressed informally" in a white T-shirt.  The other two men had "shorter hair" and were wearing "[d]arker clothes."  Ms. Takai later clarified that one of these two men was wearing a light blue shirt, "not [a] dark blue" shirt.  The man in the light blue shirt "was a little bit taller than [she was], and he was about average height."  Ms. Takai testified that none of the three men was wearing a hat.  When Mr. Gray was arrested about an hour later at a bus stop near the Fort Totten station, he was "wearing a . . . dark blue hat, yellow rim around the hat, and a dark blue shirt."[3]  Ms. Takai was later shown photographs of Mr. Gray and Mr. Smith but

---

[2]  Ms. Takai testified that the men were "about [her] age."  Ms. Takai further testified that she was twenty-five years old at the time of the trial, which was held less than a year after the robbery.  According to court documents, Mr. Gray was nineteen years old at the time of the robbery, although no mention of Mr. Gray's age was made at trial.

[3]  The surveillance footage from the Fort Totten station shows Mr. Smith with at least three other people, including two companions with dark-colored shirts.

was unable to identify them as the people who robbed her and did not identify them at trial.

Ms. Takai's description alone—of a young black man of average height, with short hair and a light blue shirt—could have applied to any number of people and was plainly insufficient to link Mr. Gray to the robbery. And Mr. Gray only imperfectly matched this vague description. At the time of his arrest, Mr. Gray was wearing a dark blue shirt, not the light blue shirt described by Ms. Takai,[4] and he was wearing a hat, unlike the robbers Ms. Takai described.[5] Ms. Takai's description would not have provided probable cause for an arrest or reasonable suspicion for an investigatory stop. *See In re T.L.L.*, 729 A.2d 334, 340 (D.C. 1999) (holding that the description of robbers as "two . . . black teenagers wearing dark clothing," one with "a 'dark' complexion, the other a 'medium' complexion,'" was "altogether lacking in particularity" and thus insufficient to

---

[4] Mr. Gray was perhaps a closer match to the other young black man with short hair whom Ms. Takai simply described as wearing "darker clothes." But this description is even more general than Ms. Takai's description of the man in the light blue shirt, and the match thus has little probative force.

[5] Mr. Gray also offered evidence at trial that he had tattoos on his arm and neck. Ms. Takai did not describe any of the three robbers as having tattoos. Given that none of the government's other witnesses remembered Mr. Gray having tattoos, a reasonable jury could have decided not to credit Mr. Gray's tattoo evidence or to give it little weight.

justify an investigatory stop); *see also McFerguson v. United States*, 770 A.2d 66, 74 n.13 (D.C. 2001) (collecting Fourth Amendment cases involving vague suspect descriptions). It is hard to see, then, how a reasonable jury could have relied on Ms. Takai's description to find beyond a reasonable doubt that Mr. Gray participated in her robbery. *See Hoffa v. United States*, 385 U.S. 293, 310 (1966) ("[T]he minimum evidence to establish probable cause . . . may fall far short of the amount necessary to support a criminal conviction."); *see also Paret-Ruiz v. United States*, 827 F.3d 167, 179 (1st Cir. 2016) (explaining that the sufficiency of the evidence standard requires "a higher degree of certainty than the probable cause standard"); *State v. Suddith*, 842 A.2d 716, 726 (Md. 2004); *Commonwealth v. Collado*, 690 N.E.2d 424, 428 n.8 (Mass. 1998); *State v. Williams*, 534 A.2d 230, 240 (Conn. 1987); *State v. Hussong*, 739 N.W.2d 922, 928 (Minn. Ct. App. 2007). Ms. Takai's failure to identify Mr. Gray further undermines whatever minimal probative force is provided by the partial match between Ms. Takai's vague description and Mr. Gray's appearance.

The government's other evidence against Mr. Gray adds little to the picture. First, there is evidence that Mr. Gray passed through the Gallery Place station on the night of Ms. Takai's robbery. But given that Gallery Place is a busy transfer station connected to the Fort Totten station by the yellow, green, and red lines, this

evidence does not meaningfully bolster what can already be inferred from the fact that Mr. Gray was later seen at the Fort Totten station.

Second, there is surveillance footage from the Fort Totten Metro station and testimony showing that Mr. Gray and Mr. Smith were together at the Fort Totten station about an hour after Ms. Takai was robbed. The footage and testimony show that Mr. Gray and Mr. Smith encountered Gerald McIntosh at the Fort Totten station, chased him when he tried to flee, and attacked him for "snitching." In addition to establishing that Mr. Gray and Mr. Smith were together for at least part of the evening on September 28,[6] the surveillance footage and testimony support an inference that they were friends who were willing to engage in risky and possibly illegal behavior with each other. In these respects, the surveillance footage and related testimony give rise to an identity inference that Mr. Gray was the individual who worked with Mr. Smith and the third unknown man to rob Ms. Takai. *See Johnson v. United States*, 683 A.2d 1087, 1093 n.4 (D.C. 1996) (en banc). But this inference is worth very little, given that an hour passed between the two incidents and the later incident occurred at a different Metro station, miles away. September 28 was a Friday night, and surveillance footage from the Fort

---

[6] Mr. Gray and Mr. Smith also both admitted at trial that they were together on September 28.

Totten station shows Mr. Smith socializing with at least three individuals—only one of whom was possibly Mr. Gray.

The evidence from the Fort Totten station has little further probative value. It is not probative of "motive, intent, common plan, . . . or absence of mistake or accident," the other four categories (besides "identity") under which bad acts evidence is typically admissible. *Jones v. United States*, 127 A.3d 1173, 1184 (D.C. 2015); *see also Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964). Indeed, there is no apparent connection between the encounter with Mr. McIntosh and the robbery of Ms. Takai, and the two episodes are not similar in any way, except that they both allegedly involved Mr. Smith and Mr. Gray and occurred on the same night.

Third, as the court explains in the majority opinion, there is significant evidence that Mr. Gray and Mr. Smith robbed Mr. McIntosh on September 21. *Ante* at 2–3. Although the evidence of the September 21 robbery of Mr. McIntosh would be excluded in a retrial of the September 28 robbery of Ms. Takai, the court is required to consider it in its sufficiency analysis. *See Lockhart v. Nelson*, 488 U.S. 33, 40–41 (1988). But as the court explains, this evidence is of negligible probative value on the issue of identity, given the dissimilarity between the two

crimes. *See ante* at 11–15. Most significantly, the McIntosh robbery "was armed, accomplished through intimidation," while the Takai robbery "was unarmed, accomplished through stealthy snatching." *Ante* at 14. Indeed, as the court notes, the prosecutor even told the trial court that it did not intend to use the evidence of the September 21 robbery to prove the identity of Ms. Takai's robbers. *Ante* at 13. At most, the evidence of the September 21 robbery, like the evidence of the September 28 McIntosh assault, gives rise to an inference that Mr. Gray and Mr. Smith were friends who were willing to participate in risky and illegal activity together.

The weak inferences summarized above that can be drawn from the evidence of the September 21 robbery and the September 28 assault can scarcely compensate for the mismatch between Mr. Gray's appearance and Ms. Takai's vague description of the robber in the light blue shirt—let alone Ms. Takai's inability to identify Mr. Gray as one of the robbers. To the extent that the majority is able to squeeze any further probative value out of the evidence of the September 21 robbery and the September 28 assault, it must be drawing a propensity inference, notwithstanding its denial that it is doing so. *Ante* at 30 n.14; *see Holmes v. United States*, 580 A.2d 1259, 1268 (D.C. 1990) ("Evidence designed to show that [defendants] had a criminally-oriented relationship with one another is

not so very different from proof that [they] were predisposed to commit crimes together . . . .").

Our case law does not allow the government to prove guilt through evidence of a defendant's criminal propensity, *see Johnson*, 683 A.2d at 1101; *Drew*, 331 F.2d at 88,[7] and a reasonable jury could not rely on a propensity inference in reaching a verdict. Moreover, although *Lockhart* requires appellate courts to consider even improperly admitted evidence when conducting a sufficiency analysis, 488 U.S. at 40–41, nothing in *Lockhart* compels appellate courts to draw improper inferences from evidence admitted, properly or improperly, at trial.

---

[7] In addition to violating our rules of evidence, the use of bad acts evidence to establish guilt based on the defendant's criminal propensity "is contrary to firmly established principles of Anglo-American jurisprudence." *McKinney v. Rees*, 993 F.2d 1378, 1380–81 (9th Cir. 1993); *see also Michelson v. United States*, 335 U.S. 469, 475 (1948) ("Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt."). Propensity and character evidence prejudices a defendant by "deny[ing] him a fair opportunity to defend against [the] particular charge." *Michelson*, 335 U.S. at 476; *accord*, *Old Chief v. United States*, 519 U.S. 172, 181–82 (1997). And while the Supreme Court has not decided the question, it is at least arguable that the Due Process Clause is implicated when the factfinder relies on improper inferences of "criminal disposition" in finding a defendant guilty. *Spencer v. Texas*, 385 U.S. 554, 572–74 (1967); *see also Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991); *Sims v. Stinson*, 101 F. Supp. 2d 187, 195–96 (S.D.N.Y. 2000) (holding that the admission of improper propensity evidence violates due process if there is a reasonable probability that the evidence affected the verdict), *aff'd*, 8 F. App'x 14 (2d Cir. 2001).

Accordingly, *Lockhart* cannot justify the majority's drawing an improper propensity inference from the surveillance footage and testimony.

It is particularly inappropriate for the court to rely on a propensity inference where, as here, such an inference would be at odds with the trial court's instructions to the jury. In the preliminary instructions, the trial court gave an instruction similar to Criminal Jury Instructions for the District of Columbia, No. 2.404 (5th ed. rev. 2012):

> Each defendant is entitled to have the issue of his guilt as to each of the crimes for which he is on trial determined from his own conduct and from the evidence that applies to him, as if he were being tried alone. You should therefore consider separately each offense and the evidence which applies to it, and you should return separate verdicts as to each charge, as to each defendant, unless I instruct you to do otherwise. The fact that you may find one defendant guilty or not guilty on one charge should not influence your verdict with respect to any other charge for that defendant. Nor should it influence your verdict with respect to the other defendant as to that same charge or any other charge.

A similar instruction, patterned on Criminal Jury Instructions for the District of Columbia, No. 2.403 (5th ed. rev. 2012), was included in the final instructions. Only by disregarding these instructions could the jury have drawn a propensity

inference from Mr. Gray and Mr. Smith's harassment and assault of Mr. McIntosh. A reasonable jury could not have disregarded these instructions, *see Jordan v. United States*, 18 A.3d 703, 709 (D.C. 2011) ("[J]urors are presumed to follow the trial court's instructions . . . ."), and neither can we in deciding whether sufficient evidence supports Mr. Gray's conviction, *cf. Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (explaining, in the civil context, that "it makes no sense" to talk about what conclusions a reasonable jury could reach "without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall"). In sum, the court's apparent reliance on a propensity inference in rejecting Mr. Gray's sufficiency claim is unjustified by *Lockhart* and contrary to law.

This court's decision in *Smith v. United States*, 561 A.2d 468 (D.C. 1989), provides strong authority on a very similar fact pattern that the evidence here is insufficient. In *Smith*, two defendants, Darryl Harris and Michael Smith, were alleged to have committed three robberies over a period of a few hours. *Id.* at 469–70. The victim of one of the robberies, Ms. Adami, described the robbers as "two black men," one with a "short brown leather coat" and the other with a "light-colored cream coat." *Id.* at 469. Ms. Adami testified that the men pushed her as she was leaving a building, and she then noticed that her wallet had been taken

from her shoulder bag. *Id.* She confronted the two men, but they denied taking her wallet and walked away "briskly." *Id.* Still photographs from a surveillance camera in the building's lobby corroborated Ms. Adami's account, showing a man "wearing a tan trenchcoat draped over his shoulders and a dark-colored hat" and another man "wearing a waist-length dark-colored jacket." *Id.* The stills were "extremely blurry," however, "rendering identification of the attire or facial characteristics of the individuals . . . impossible." *Id.* at 470. Mr. Harris and Mr. Smith were arrested several hours later, after committing the other two robberies. *Id.* at 470. At the time of arrest, Mr. Harris was wearing, among other things, a "tan trenchcoat draped over his shoulder[ and] a dark-colored beret," and Mr. Smith was wearing "a brown waist-length leather jacket." *Id.* Ms. Adami was not able to identify Mr. Harris or Mr. Smith as the robbers, but Mr. Harris confessed to the robbery. *Id.* at 469, 471. In a joint trial, the two men were convicted of committing two of the three robberies, including the one involving Ms. Adami.[8] *Id.* at 469.

---

[8] Mr. Harris was only charged with two of the robberies. Mr. Smith was charged with all three but was acquitted on one of the counts. *Smith*, 561 A.2d at 469.

This court reversed Mr. Smith's conviction for the Adami robbery on sufficiency grounds. *Id.* at 472. The court relied on the fact that Ms. Adami could not identify either man and that the surveillance stills were too fuzzy to permit identification. *Id.* Given that in the present case Ms. Takai was similarly unable to identify the people who robbed her, and given that, as was the case with Michael Smith in *Smith*, there is little other evidence connecting Mr. Gray to the robbery, the evidence supporting Mr. Gray's robbery conviction is likewise insufficient. This conclusion is strengthened by the fact that Ms. Adami's description of her assailants in *Smith*, as bolstered by the admittedly fuzzy surveillance stills, was less generic than Ms. Takai's description of her robbers, and yet was still held to be insufficient.

The court in *Smith* apparently also deemed it inappropriate to consider the fact that Mr. Smith committed at least one other robbery with Mr. Harris—or considered this fact to be of little probative significance: it made no mention of the other robbery in its sufficiency analysis of the Adami robbery. *See id.* at 472.[9]

---

[9] Judge Steadman highlighted this evidence in his partial dissent in the case. *See Smith*, 561 A.2d at 475 (Steadman, J., concurring in part and dissenting in part) ("[T]he jury could properly have found Smith to have been a proven confederate of Harris in [one of the other three robberies]. Harris by his own admission participated in both the [other robbery] and [the] Adami robber[y] . . . ."). The court nevertheless declined to rely on it.

The court in the present case should similarly refrain from drawing improper propensity inferences about Mr. Gray from the evidence about Mr. Smith and Mr. Gray's other bad acts.

For these reasons, and under our precedent in *Smith*, the government's evidence in support of Mr. Gray's conviction for the robbery of Ms. Takai is insufficient.[10] A reasonable jury—particularly one that is not relying on an improper propensity inference—could not conclude beyond a reasonable doubt that Mr. Gray is guilty of the robbery. Accordingly, I would hold that the Double Jeopardy Clause bars a retrial of Mr. Gray's September 28 robbery charge.

---

[10] *See also United States v. Bonner*, 648 F.3d 209 (4th Cir. 2011) (holding that the evidence that the defendant committed an armed robbery was insufficient where the defendant's girlfriend's vehicle was seen leaving the scene of the crime; a search of the vehicle revealed, among other things, ammunition and the defendant's identification card, wallet, and cell phone; a Yankees hat containing the defendant's and others' DNA was found at the scene; and the victims described one of the robbers as an "African American male" wearing a Yankees hat, but could not identify the defendant, who was an African American); *Christopher v. State*, 82 So. 3d 1238, 1239 (La. 2012) (same where "the victim . . . could not positively identify his assailant and gave a description at odds with [the defendant's] appearance and with the descriptions of their assailant provided by the . . . victims" of other armed robberies of which the defendant was convicted, and where this robbery was separated in time from the other robberies); *State v. Walker*, 731 A.2d 545, 550–51 (N.J. Super. Ct. App. Div. 1999) (same where the victim could not identify the defendant in court and said only that a photograph of the defendant "looked like" the robber and where the victim could not remember the details of the car that the robber drove).